UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
TZAC, INC.,

                        Plaintiff,

        v.

NORWEGIAN PEOPLE'S AID
a/k/a NORSK FOLKEHJELP,

                        Defendant.

15 Civ. 4892 (GHW)

UNITED STATES OF AMERICA,

                        Plaintiff-Intervenor,

        v.

NORWEGIAN PEOPLE'S AID
a/k/a NORSK FOLKEHJELP,

                        Defendant.

## STIPULATION AND ORDER OF SETTLEMENT AND DISMISSAL

WHEREAS, this Stipulation and Order of Settlement and Dismissal ("Stipulation") is entered into by and among plaintiff the United States of America ("United States" or "Government"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York; the *qui tam* relator in the above-captioned action, TZAC, Inc. ("Relator"), by Relator's authorized representatives; and defendant Norwegian People's Aid a/k/a Norsk Folkehjelp ("NPA" and together with the Government and Relator, "Parties"), by its authorized representatives;

WHEREAS, NPA describes itself as a humanitarian organization with four main priority areas: (1) first aid and rescue services, (2) social inclusion work and work with refugees, (3) work removing mines and other explosives, and (4) long-term development work;

WHEREAS, from July 2012 through the date of this Stipulation ("Covered Period"), NPA received federal grant funds from the U.S. Agency for International Development ("USAID"). NPA's receipt of those grant funds was conditioned on NPA submitting certifications to USAID as to how NPA had conducted certain of its operations and how it would conduct its operations in the future, including that (1) within the last ten years (*i.e.*, as far back as 2002), it had not provided material support to any individual or entity that was a prohibited party under U.S. law, and (2) going forward, it would take all reasonable steps to ensure that does not provide material support to any such individual or entity;

WHEREAS, the Government alleges that, during the Covered Period, NPA's above-referenced certifications to USAID were false because NPA intentionally or recklessly or with deliberate ignorance provided material support to prohibited parties under U.S. law in connection with its participation in (1) oil exploration and processing activities in Iran during the period 2001 through 2008, and (2) a program titled "Youth of Today . . . Leaders of Tomorrow" in the Gaza Strip during the period 2012 through 2016. As a result of the foregoing conduct, the Government alleges that NPA intentionally or recklessly or with deliberate ignorance presented or caused to be presented false claims for USAID grant funds, or made, used, or caused to be made or used false records and/or statements material to false claims for USAID grant funds, in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* The conduct described in this paragraph is the "Covered Conduct" for purposes of this Stipulation;

2

WHEREAS, on June 24, 2015, Relator filed a *qui tam* complaint against NPA in the United States District Court for the Southern District of New York ("Relator Complaint"), in which Relator alleged that NPA had been receiving federal grant funds from USAID in violation of the FCA based on, *inter alia*, the Covered Conduct;

WHEREAS, contemporaneous with the filing of this Stipulation, the Government is filing a Notice of Election to Intervene and a Complaint-In-Intervention in the above-referenced *qui tam* action ("Government Complaint"), in which it is asserting claims against NPA arising under the FCA and the common law for the Covered Conduct; and

WHEREAS, the Parties have, through this Stipulation, reached a mutually agreeable resolution addressing the claims asserted against NPA in the Government Complaint and the Relator Complaint;

NOW, THEREFORE, upon the Parties' agreement, IT IS HEREBY ORDERED, as set forth in Paragraphs 1, 2 and 3 below, that:

1.      NPA shall pay the Government $1,350,000 within fourteen (14) business days of the Effective Date (defined below in Paragraph 30).  NPA shall pay the Government an additional $675,000 in accordance with paragraphs 1(a) through 1(d) below.  The $2,025,000 referenced in the prior two sentences shall be referred to herein, collectively, as the "Settlement Amount."  Payment of the Settlement Amount shall not be from funds provided to NPA by USAID or any other agency or instrumentality of the United States.

        a.      NPA shall pay the Government an additional $225,000 on or before March 1, 2019.

        b.      NPA shall pay the Government an additional $225,000 on or before March 1, 2020.

3

      c.      NPA shall pay the Government an additional $225,000 on or before March 1, 2021.

      d.      If paying any of the amounts referenced above in Paragraphs 1(a) through 1(c), on the date such payment is due, would leave NPA with a Contingency Fund (defined below in this Paragraph) on that date of less than $11 million, NPA shall pay as much of the amount due on that date as would leave NPA with a Contingency Fund of $11 million after such payment, and it shall pay the remainder of the amount due on the earliest date thereafter where doing so would leave NPA with a Contingency Fund of at least $11 million after such payment. At all times until the Settlement Amount is paid in full, NPA shall seek in good faith to maintain a Contingency Fund of at least $12 million. For purposes of this Paragraph, the term Contingency Fund refers to the monies in NPA's operating budget that (1) under the terms of the funding agreements between NPA and its donors, are not required to be used in connection with any particular project, and (2) are available for use by NPA to pay debts or expenses, including in the case of unexpected shortfalls in revenue. To the extent NPA fails to pay any of the amounts referenced above in Paragraphs 1(a) through 1(c) in full on the date such payment is due, NPA shall provide a written account to the Government, in the manner set forth in Paragraph 29 below, of the amount of money comprising the Contingency Fund as of that date, why the Contingency Fund contained less than $12 million as of that date, and how and when NPA intends to return the Contingency Fund to a funding level of at least $12 million. Such written explanation shall be provided within seven (7) calendar days of the due date of the relevant payment under Paragraph 1(a), 1(b) or 1(c).

      2.      NPA shall revise its internal policies to ensure that it complies with applicable U.S. laws and the terms of the grants it receives. Such revisions — including revisions NPA has

4

already made to its Policy on Compliance with USAID Grants and U.S. Economic Sanctions Programs in connection with the negotiation of this Stipulation (the revised Policy on Compliance with USAID Grants and U.S. Economic Sanctions Programs is attached to this agreement as Exhibit A and any material violations of this policy would constitute a "Default" under Paragraph 11 below) — shall include providing for additional training of NPA managers and administrative staff on compliance with applicable U.S. laws and grant terms; regular audits by an external auditor of NPA's compliance with applicable U.S. laws and grant terms; and periodic reviews for purposes of making appropriate updates to relevant NPA internal policies and procedures. Upon request by USAID or any other U.S. agency that has provided NPA with grants or any other type of funding ("U.S. Funding Agency" and, collectively, "U.S. Funding Agencies"), NPA shall provide such U.S. Funding Agency with a list of the managers and administrative staff who received the above-referenced training, together with a description of the training they received. Further, upon request by any U.S. Funding Agency, NPA shall provide such U.S. Funding Agency with a written report, prepared by the above-referenced external auditor, of the results of each of the above-referenced audits, as well as a description of any actions taken by NPA in response to such audits. Upon request, NPA shall also provide any U.S. Funding Agency with current copies of the policies it has enacted to ensure that it complies with applicable U.S. laws and the terms of the grants it receives.

      3.     NPA shall cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement, consistent with NPA's obligations under Norwegian law. Upon reasonable notice, NPA shall encourage, and not impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and

testimony, consistent with the rights and privileges of such individuals. NPA shall furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf, as well as complete and unredacted copies of any other non-privileged documents in its possession, custody, or control relating to the Covered Conduct.

NOW THEREFORE, the remainder of this Stipulation reflects matters to which the Parties have agreed. The Court shall retain jurisdiction to enforce NPA's obligations as ordered in Paragraphs 1, 2 and 3 above, as well as, upon appropriate application by one or more Parties, the obligations of the Parties as agreed to below.

4. The Parties agree that this Court has subject matter jurisdiction over this action and consent to this Court's exercise of personal jurisdiction over each of them.

5. NPA admits, acknowledges, and accepts responsibility for the following conduct:

    a. As a condition of receiving funding from the U.S. Agency for International Development ("USAID"), NPA periodically submitted certifications to USAID ("Certifications"), in which it represented, among other things, that "to the best of its current knowledge, [it] did not provide, within the previous ten years, and will take all reasonable steps to ensure that it does not and will not knowingly provide, material support or resources" to any individual or entity that is a prohibited party under U.S. law.

    b. In the Certifications, NPA further represented that before providing material support to any individual or entity, it would, among other things, verify that the individual or entity did not appear on the U.S. Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List ("SDN List").

    c. NPA submitted Certifications to USAID from at least July 2012 through January 2016; in those Certifications, NPA made representations about its lack of provision of material support dating back to July 2002.

d.   During the period 2001 through 2008, the National Iranian Oil Company
("NIOC") — an entity owned or controlled by the Government of Iran —
contracted with a Norwegian oil company (the "Norwegian Oil
Company") to perform oil exploration and processing activities in Iran.
The Norwegian Oil Company, in turn, contracted with NPA — an expert
in the clearance of landmines and other unexploded ordnance — to assist
with this oil development project.  Specifically, NPA was engaged to work
with the Iranian Army and NIOC and perform mine clearance activities in
connection with the project.  Among other things, NPA (1) conducted risk
assessments of the areas in Iran where the oil exploration and processing
activities were to occur, (2) surveyed those areas for landmines and other
unexploded ordnance, (3) trained members of the Iranian Army on how to
conduct mine clearance activities, (4) accompanied and advised members
of the Iranian Army as they conducted mine clearance activities in the
relevant areas, and (5) conducted some mine clearance activities itself.

e.   NPA's participation in the oil development project was inconsistent with
its Certifications to USAID.  Throughout the period covered by the
Certifications, Iran was classified by the U.S. State Department as a "state
sponsor of terrorism."  Publicly available reports issued by the State
Department annually reflected this designation.  The State Department
reports also identified Iran as a supporter of specific groups that appeared
on the SDN List.  Additionally, for a portion of the relevant period, NIOC
was included on the SDN List.

f.   Moreover, during the period 2012 through 2016, NPA funded a project
titled "Youth of Today . . . Leaders of Tomorrow," through which young
people in the Gaza Strip, aged 15 through 28, were provided training
aimed at making them more effective participants in the political process.
Such training included programs intended to improve the participants'
ability to organize, debate, negotiate, advocate for their positions, and
resolve conflicts.  These programs were taught by experienced
professionals, were typically held over the course of multiple days, and, in
total, comprised more than 250 hours of instructional time.

g.   Through the "Youth of Today . . . Leaders of Tomorrow" project, NPA
also funded numerous workshops attended by young people in the Gaza
Strip and senior officials from several of the region's prominent political
parties.  Some of those political parties were prohibited parties under U.S.
law.  The purpose of these workshops was to reduce a trust gap that was
perceived to exist between youth in the region and the attending political
parties, and to enhance communication between the two groups.  NPA
periodically received reports concluding that the workshops were
successful in bridging the trust gap between youth and the political parties,
and reflecting that certain of the political parties, including political parties

7

that were prohibited parties under U.S. law, had altered their behavior in response to issues raised during the workshops.

h.    The "Youth of Today . . . Leaders of Tomorrow" training programs and workshops were conducted in a manner that was inconsistent with NPA's Certifications to USAID, in that they were attended by representatives of entities that were prohibited parties under U.S. law, including entities that were identified on the SDN List as prohibited parties.

6.    The payment required by Paragraph 1 above shall be made in accordance with instructions to be provided by the Financial Litigation Unit of the United States Attorney's Office for the Southern District of New York.

7.    Subject to the exceptions in Paragraph 10 below (concerning excluded claims) and Paragraph 18 below (concerning bankruptcy proceedings), and conditioned on NPA's full compliance with the terms of this Stipulation, including full payment of the Settlement Amount as set forth in Paragraph 1 above, the United States releases NPA from any civil or administrative monetary claim that the United States has for the Covered Conduct under the FCA, the Program Fraud Civil Remedies Act, 31 U.S.C. § 3801-3812, or the common law theories of fraud, payment by mistake and unjust enrichment.

8.    Subject to the exceptions in Paragraph 18 below (concerning bankruptcy proceedings), and conditioned on NPA's full payment of the Settlement Amount as set forth in Paragraph 1 above, Relator, and Relator's heirs, successors, attorneys, agents, and assigns, releases NPA from (a) any claims that Relator has asserted or could have asserted against NPA for any act, event, or conduct relating to the allegations in the Relator Complaint or the Government Complaint; and (b) any claims that Relator has on behalf of the United States for the conduct alleged in the Relator Complaint or the Government Complaint; provided, however, that nothing in this Stipulation shall preclude Relator from seeking to recover Relator's expenses, costs, or attorney's fees from NPA pursuant to 31 U.S.C. § 3730(d).

9.      In consideration of the execution of this Stipulation by Relator, and the releases by Relator as set forth in Paragraph 8 above, NPA releases Relator, and Relator's heirs, successors, attorneys, agents, and assigns, individually and collectively, from any claims that NPA has asserted or could have asserted for any act, event, or conduct relating to the allegations in the Relator Complaint or the Government Complaint.

10.     Notwithstanding the releases given in Paragraph 7 above, or any other term of this Stipulation, the following claims of the Government are specifically reserved and are not released by this Stipulation:

    a.      any liability arising under Title 26, United States Code (Internal Revenue Code);

    b.      any criminal liability;

    c.      except as explicitly stated in this Stipulation, any civil or administrative liability, including the suspension and debarment rights of any federal agency;

    d.      any liability to the Government (or its agencies) for any conduct other than the Covered Conduct;

    e.      any liability based upon obligations created by this Stipulation; and

    f.      any liability of individuals.

11.     NPA shall be in default of this Stipulation if NPA fails to make any of the required payments set forth in Paragraph 1 above on or before the due date, or if it fails to comply materially with any other term of this Stipulation that applies to it ("Default"). The Government shall provide written notice of any Default in the manner set forth in Paragraph 29 below.  NPA shall then have an opportunity to cure the Default within ten (10) calendar days from the date of delivery of the notice of Default.  In the event that a Default is not fully cured

within ten (10) calendar days of the delivery of the notice of Default ("Uncured Default"), NPA

agrees to the entry of the consent judgment attached hereto as Exhibit B in the amount of

$2,025,000 and that the Government may take action to collect on any portion of the Settlement

Amount that has not yet been paid. In the event of an Uncured Default, NPA further agrees that

interest shall accrue at the rate of 12% per annum compounded daily on the remaining unpaid

principal balance of the Settlement Amount, beginning seven (7) business days after mailing of

the notice of Default. In the event of an Uncured Default, NPA further agrees that the United

States, at its option, may (a) rescind the releases in this Stipulation and pursue any claim that

would otherwise be covered by the releases provided in Paragraph 7 above (in the event the

Government rescinds the releases in this Stipulation, Relator could also pursue any claims in the

Relator Complaint that would otherwise be released by this Stipulation); (b) seek specific

performance of this Stipulation; (c) offset the remaining unpaid balance of the Settlement

Amount (including interest) from any amounts due and owing NPA by any department, agency,

or agent of the United States; or (d) exercise any other rights granted by law, or under the terms

of this Stipulation, or recognizable at common law or in equity. NPA shall not contest any offset

imposed or any collection undertaken by the Government pursuant to this Paragraph, either

administratively or in any Federal or State court. In addition, NPA shall pay the Government all

reasonable costs of collection and enforcement under this Paragraph, including attorneys' fees

and expenses. In the event that the United States opts to rescind this Stipulation pursuant to this

Paragraph, NPA shall not plead, argue, or otherwise raise any defenses under the theories of

statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims

that relate to the Covered Conduct.

12.    Relator, and Relator's heirs, successors, attorneys, agents, and assigns, shall not object to this Stipulation but agree and confirm that the terms of this Stipulation are fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Subject to any claims that Relator may have under 31 U.S.C. § 3730(d) and the separate Stipulation and Order of Settlement and Release between Relator and the United States addressing Relator's share of the Settlement Amount, Relator, and Relator's heirs, successors, attorneys, agents, and assigns, releases, waives, and forever discharges the United States, its agencies, officers, agents, employees, and servants, from any claims, known or unknown, arising from the filing of the Relator Complaint and from any claims under 31 U.S.C. § 3730.

13.    NPA waives and shall not assert any defenses NPA may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Stipulation bars a remedy sought in such criminal prosecution or administrative action. Nothing in this Paragraph or any other provision of this Stipulation constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

14.    NPA fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that NPA has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, or servants, related to the Covered Conduct, or the United States' investigation, prosecution and settlement of the Covered Conduct.

11

15.    This Stipulation is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity except as otherwise provided herein.

16.    In connection with the negotiation of this Stipulation, NPA represents that it has, in good faith, provided to the Government, in connection with the Government's assessment of NPA's ability to pay a monetary settlement, financial disclosure statements (the "Financial Statements"), and it warrants that the Financial Statements are complete, accurate and current. The Government has relied on the accuracy and completeness of those Financial Statements in entering into this Stipulation.  If the Government learns of any asset(s) in which NPA had an interest on the Effective Date that NPA did not include in the Financial Statements, or if the Government learns of any misrepresentation by NPA on, or in connection with, the Financial Statements, and if such misrepresentation changes the net worth of NPA as reflected in the Financial Statements by $100,000 or more, the Government may at its option: (a) rescind the releases in this Stipulation and pursue any civil and/or administrative claim, action, or proceeding against NPA that would otherwise be covered by the releases in Paragraph 7 above (in the event the Government rescinds the releases in this Stipulation, Relator could also pursue any claims in the Relator Complaint that would otherwise be released by this Stipulation), or (b) let the Stipulation stand and collect the full Settlement Amount plus one hundred percent (100%) of the value of the net worth of NPA that was previously undisclosed.  NPA agrees not to contest any collection action undertaken by the Government pursuant to this provision, and immediately to pay the Government all reasonable costs incurred in such an action, including attorney's fees and expenses.  In the event that the Government opts to rescind this Stipulation pursuant to this Paragraph, NPA agrees not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil and/or administrative

12

claim, action, or proceeding against NPA that is brought by the Government (or Relator) within 180 calendar days of written notification that the releases in the Stipulation have been rescinded, except to the extent such defenses were available on the date the Relator Complaint was originally filed.

17.    NPA represents and warrants that it has reviewed its financial situation, that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and that it reasonably believes as of the date hereof that it shall remain solvent following compliance with its obligations under this Stipulation.  Further, the Parties warrant that, in evaluating whether to execute this Stipulation, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to NPA within the meaning of 11 U.S.C. § 547(c)(1); and (b) have concluded that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.  Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which NPA was or became indebted to on or after the date of this Stipulation, within the meaning of 11 U.S.C. § 548(a)(1).

18.    If NPA commences, or a third party commences, any case, action, or other proceeding under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking an order for relief of NPA's debts, or seeking to adjudicate NPA as bankrupt or insolvent; or (b) seeking appointment of a trustee, custodian, or other similar official for NPA or for all or any substantial part of NPA's assets, NPA agrees as follows:

a.    NPA's obligations under this Stipulation may not be avoided pursuant to 11 U.S.C. § 547, and NPA shall not argue or otherwise take the position in any such case, action,

or proceeding that (i) NPA's obligations under this Stipulation may be avoided under 11 U.S.C.
§ 547; (ii) NPA was insolvent at the time this Stipulation was entered into; or (iii) the mutual
promises, covenants, and obligations set forth in this Stipulation do not constitute a
contemporaneous exchange for new value given to NPA.

      b.     If NPA's obligations under this Stipulation are avoided for any reason,
including, but not limited to, through the exercise of a trustee's avoidance powers under the
Bankruptcy Code, the Government, at its sole option, may rescind the releases in this Stipulation
and pursue any civil and/or administrative claim, action, or proceeding against NPA that would
otherwise be covered by the releases in Paragraph 7 above (in the event the Government rescinds
the releases in this Stipulation, Relator could also pursue any claims in the Relator Complaint
that would otherwise be released by this Stipulation).  NPA agrees that (i) any such claim, action,
or proceeding brought by the Government (or Relator) would not be subject to an "automatic
stay" pursuant to 11 U.S.C. § 362(a) as a result of the case, action, or proceeding described in the
first clause of this Paragraph, and NPA shall not argue or otherwise contend that the claim,
action, or proceeding is subject to an automatic stay; (ii) NPA shall not plead, argue, or
otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or
similar theories, to any claim, action, or proceeding that is brought by the Government (or
Relator) within 180 calendar days of written notification that the releases in the Stipulation have
been rescinded pursuant to this Paragraph, except to the extent such defenses were available on
the date the Relator Complaint was originally filed; and (iii) the Government has a valid claim
against NPA for $2,025,000, and the Government may pursue the claim in the case, action, or
proceeding described in the first clause of this Paragraph, as well as in any other case, action, or
proceeding.

      c.     NPA acknowledges that the agreements in this Paragraph are provided in exchange for valuable consideration provided in this Stipulation.

     19.    NPA agrees to the following:

      a.     Unallowable Costs Defined:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of NPA, and its present or former officers, directors, employees, shareholders, and agents, in connection with:

       (1)    the matters covered by this Stipulation;

       (2)    the United States' audit(s) and civil and/or criminal investigation(s) of matters covered by this Stipulation;

       (3)    NPA's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and/or criminal investigation(s) in connection with matters covered by this Stipulation (including attorneys' fees);

       (4)    the negotiation and performance of this Stipulation; and

       (5)    any payments NPA makes to the Government pursuant to this Stipulation, and any payments that NPA may make to Relator, including costs and attorney's fees,

are unallowable costs for government contracting purposes (hereinafter referred to as "Unallowable Costs").

      b.     Future Treatment of Unallowable Costs:  Unallowable Costs shall be separately determined and accounted for by NPA, and NPA shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States.

      c.     Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Stipulation, NPA shall identify and repay by

15

adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by NPA or any of its subsidiaries or affiliates from the United States. NPA agrees that the United States, at a minimum, shall be entitled to recoup from NPA any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine NPA's books and records and to disagree with any calculations submitted by NPA or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by NPA, or the effect of any such Unallowable Costs on the amount of such payments.

20.     Upon receipt of the initial, $1,350,000 payment as described in Paragraph 1 above, the United States and Relator shall file pursuant to Rule 41(a)(1) a Notice of Dismissal of the Government Complaint and Relator Complaint, respectively. As to the United States, the dismissal shall be with prejudice only as to claims for the Covered Conduct that are being released pursuant to this Stipulation, and shall be without prejudice as to all other claims. As to Relator, the dismissal shall be with prejudice as to all claims in the Relator Complaint.

21.     Except as set forth in Paragraph 8 above (which preserves Relator's rights against NPA to seek expenses, costs, and attorneys' fees), each Party shall bear its own legal and other costs incurred in connection with this matter.

22.     Any failure by the Government to insist upon the full or material performance of any of the provisions of this Stipulation shall not be deemed a waiver of any of the provisions hereof, and the Government, notwithstanding that failure, shall have the right thereafter to insist upon the full or material performance of any and all of the provisions of this Stipulation.

23.     This Stipulation is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Stipulation is the United States District Court for the Southern District of New York. For purposes of construing this Stipulation, this Stipulation shall be deemed to have been drafted by all Parties to this Stipulation and shall not, therefore, be construed against any Party in any subsequent dispute.

24.     This Stipulation constitutes the complete agreement between the Parties with respect to the subject matter hereof. This Stipulation may not be amended except by written consent of the Parties.

25.     The undersigned counsel and any other signatories represent and warrant that they are fully authorized to execute this Stipulation on behalf of persons and the entities indicated below.

26.     This Stipulation is binding on NPA and any successor entities.

27.     This Stipulation is binding on Relator's successors, transferees, heirs, and assigns.

28.     This Stipulation may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Stipulation. E-mails that attach signatures in PDF form or facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Stipulation.

29.     Any notices or requests pursuant to this Stipulation shall be in writing and shall be delivered by hand, express courier, or email transmission followed by postage-prepaid mail, and shall be addressed as follows:

IF TO THE UNITED STATES:

Christopher B. Harwood
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Email: christopher.harwood@usdoj.gov

IF TO NPA:

David Schertler
SCHERTLER & ONORATO, LLP
1101 Pennsylvania Ave., NW
Suite 1150
Washington, D.C. 20004
Email: dschertler@schertlerlaw.com

30.   The Effective Date of this Stipulation is the date upon which the Stipulation is approved and entered by the Court.

Agreed to by:

### THE UNITED STATES OF AMERICA

Dated:      New York, New York
            March 30, 2018

                                GEOFFREY S. BERMAN
                                United States Attorney for the
                                Southern District of New York

                   By:          _____
                                CHRISTOPHER B. HARWOOD
                                Assistant United States Attorney
                                86 Chambers Street, Third Floor
                                New York, New York 10007

                                *Attorney for the United States of America*

RELATOR

Dated: March 30, 2018

By: _____

DAVID ABRAMS
305 Broadway, Suite 601
New York, New York 10007

*Attorney for Relator*

NPA

Dated: March 28, 2018

SCHERTLER & ONORATO, LLP

By: _____
DAVID SCHERTLER
1101 Pennsylvania Ave., NW
Suite 1150
Washington, D.C. 20004

*Attorney for NPA*

SO ORDERED:

_____
HON. GREGORY H. WOODS
UNITED STATES DISTRICT JUDGE

Dated: March 30, 2018

21

# Exhibit A

## POLICY ON COMPLIANCE WITH USAID GRANTS AND
## U.S. ECONOMIC SANCTIONS PROGRAMS

As a recipient of grants from the United States Agency for International Development ("USAID") in support of NPA's programs and projects, NPA recognizes that USAID requires recipients to certify their compliance with certain applicable U.S. federal laws and policies as a condition of receiving USAID grants (the "Certifications"). NPA shall take all appropriate steps to ensure compliance with the Certifications and with all applicable laws and policies that may be encompassed within those Certifications, including by taking the following actions:

1. NPA will provide regular training to appropriate managers and administrative staff on compliance with USAID grant conditions and terms and relevant U.S. laws and policies related to grant compliance. The appropriate managers and administrative staff to whom such training shall be provided will include all staff responsible for implementing U.S. federal grants.

2. NPA will take all reasonable measures to confirm that all those who receive a benefit pursuant to the grants USAID provides to NPA meet the requirements of the relevant grant agreements, including the Certifications, and are otherwise eligible to receive the benefit.

3. NPA will engage an external auditor to audit NPA's compliance with (i) the terms and conditions of its USAID grants, including the Certifications, and (ii) its policies and procedures designed to ensure grant compliance, including the procedures described in this Policy document. Such audits shall be conducted on a regular basis and not less than annually. NPA shall supplement the external audits with an audit by NPA's internal auditor at least once annually. NPA shall take all appropriate steps to address any issues that may arise from such audits.

4. NPA will periodically review and update NPA's policies and procedures as appropriate, consistent with the commitments set forth in this Policy document.

As a foreign entity receiving funds from USAID, NPA recognizes that it must comply with all terms and conditions of awarded grants, including the Certifications, as well as the U.S. economic sanctions programs that may be encompassed within those Certifications. NPA shall take all appropriate steps to comply with those sanctions programs, to the extent such compliance is required by the Certifications, including by taking the following actions:

1. NPA will provide regular training to appropriate managers and administrative staff on compliance with applicable U.S. economic sanctions programs. The appropriate managers and administrative staff to whom such training shall be provided will include all staff responsible for confirming that NPA takes the actions required by the paragraphs below.

2. NPA will take all reasonable measures to confirm that the following individuals, entities, and countries are not included on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") or the list of State Sponsors of Terrorism ("State Sponsors of

1

Terrorism List") maintained by the U.S. Department of State ("DOS"), in advance of hiring, engagement, funding, or contract or project execution, as applicable:

    (i)      employees of NPA,
    (ii)     contractors, vendors and suppliers of NPA,
    (iii)    partners of NPA, and
    (iv)    individuals, entities, or countries receiving funding or training or expert advice or assistance from NPA.

For purposes of this Policy document, the term "training" means instruction or teaching designed to impart a specific skill or skills, as opposed to general knowledge, and the phrase "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

3. NPA will prevent any individual from receiving training or expert advice or assistance from NPA to the extent that NPA is on notice that the individual is receiving the training or expert advice or assistance in his or her capacity as a member or representative of any entity or country included on OFAC's SDN List or DOS's State Sponsors of Terrorism List.

4. NPA will engage an external auditor to audit NPA's compliance with applicable U.S. economic sanctions programs, as well as its policies and procedures designed to ensure such compliance, including the procedures described in this Policy document. Such audits shall be conducted on a regular basis and not less than annually. NPA shall supplement the external audits with an audit by NPA's internal auditor at least once annually. NPA shall take all appropriate steps to address any issues that may arise from such audits.

5. NPA will periodically review and update its policies and procedures relating to recruiting and employment, purchasing and procurement, grants and contracts, partner relationships and funding, and other NPA policies and procedures as appropriate, to reflect the foregoing.

Dated: March 28, 2018

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
TZAC, INC.,

                    Plaintiff,

          v.

NORWEGIAN PEOPLE'S AID
a/k/a NORSK FOLKEHJELP,

                    Defendant.

                                        15 Civ. 4892 (GHW)

UNITED STATES OF AMERICA,

                    Plaintiff-Intervenor,

          v.

NORWEGIAN PEOPLE'S AID
a/k/a NORSK FOLKEHJELP,

                    Defendant.

    Upon the consent of plaintiff the United States of America and defendant Norwegian

People's Aid a/k/a Norsk Folkehjelp ("NPA") it is hereby

    ORDERED, ADJUDGED and DECREED:  that plaintiff the United States of America is

awarded judgment in the amount of $2,025,000 as against NPA, as well as post-judgment

interest at the rate of 12% per annum compounded daily.

Agreed to by:


THE UNITED STATES OF AMERICA


Dated:        New York, New York
              March 29, 2018

                        GEOFFREY S. BERMAN
                        United States Attorney for the
                        Southern District of New York


        By:     _____
                CHRISTOPHER B. HARWOOD
                Assistant United States Attorney
                86 Chambers Street, Third Floor
                New York, New York 10007

                *Attorney for the United States of America*

NPA

Dated: March 28, 2018

SCHERTLER & ONORATO, LLP

By: _____

DAVID SCHERTLER
1101 Pennsylvania Ave., NW
Suite 1150
Washington, D.C. 20004

*Attorney for NPA*

SO ORDERED:

_____
HON. GREGORY H. WOODS
UNITED STATES DISTRICT JUDGE

Dated: March 30 2018