GEOFFREY S. BERMAN
United States Attorney
By: CHRISTOPHER B. HARWOOD
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007
Tel.: (212) 637-2728
Email: Christopher.Harwood@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TZAC, INC., <br><br> Plaintiff, <br><br> v. <br><br> NORWEGIAN PEOPLE'S AID a/k/a NORSK FOLKEHJELP, <br><br> Defendant. | |
| UNITED STATES OF AMERICA, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> NORWEGIAN PEOPLE'S AID a/k/a NORSK FOLKEHJELP, <br><br> Defendant. | 15 Civ. 4892 (GHW) <br><br> **COMPLAINT-IN-INTERVENTION** |

Plaintiff United States of America (the "United States" or "Government"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, brings this action against Norwegian People's Aid a/k/a Norsk Folkehjelp ("NPA"), alleging upon information and belief as follows:

1

## PRELIMINARY STATEMENT

1.  This is a civil action brought by the United States against NPA under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), and the common law to recover damages sustained by, and civil penalties owed to, the United States based on NPA's violation of the FCA as a result of its provision of material support or resources to Iran, Hamas, the Popular Front for the Liberation of Palestine ("PFLP") and the Democratic Front for the Liberation of Palestine ("DFLP"). At all times relevant to this complaint, Iran was included on the U.S. Department of State's ("USDOS") list of state sponsors of terrorism ("State Sponsors of Terrorism List"), and Hamas, PFLP and DFLP were included on the U.S. Office of Foreign Assets Control's ("OFAC") Specially Designated Nationals and Blocked Persons List ("SDN List"). NPA provided material support or resources to Iran from 2001 through 2008, and to the three SDN List entities from 2012 through 2016.

2.  USDOS's State Sponsors of Terrorism List includes countries that USDOS has determined have repeatedly provided support for acts of international terrorism. Designation as a state sponsor of terrorism may result in restrictions on U.S. foreign assistance, a ban on defense exports and sales, and financial and other restrictions.

3.  OFAC's SDN List is a list of individuals and entities that are found to support terrorism or otherwise engage in conduct antithetical to U.S. interests. Collectively, such individuals and entities are referred to as "Specially Designated Nationals" or "SDNs." The U.S.-based assets of SDNs are frozen and U.S. persons generally are prohibited from interacting with them.

4. Iran has been on the State Sponsors of Terrorism List since 1984, while Hamas, PFLP and DFLP were on the SDN List at all times relevant to this complaint.

5. NPA is a non-profit, non-governmental organization ("NGO") headquartered in Norway. NPA describes itself as a humanitarian organization with four main priority areas: (1) the removal of landmines and other explosives, (2) long-term development work, (3) first aid and rescue services, and (4) social inclusion work and work with refugees.

6. Since at least 2012, NPA has received monetary grants from the U.S. Agency for International Development ("USAID") to fund various projects and programs. As a condition of receiving those grants, NPA submitted certifications to USAID each year in which it represented, among other things, that,

> to the best of its current knowledge, it did not provide within the previous ten years, and will take all reasonable steps to ensure that it does not and will not knowingly provide, material support or resources to any individual or entity that commits, attempts to commit, advocates, facilitates, or participates in terrorist acts, or has committed, attempted to commit, facilitated, or participated in terrorist acts.

In the annual certifications, NPA further represented that "[b]efore providing any material support or resources to an individual or entity," it would (1) "verify that the individual or entity does not appear . . . on the master list of Specially Designated Nationals and Blocked Persons . . . maintained by [OFAC]"; and (2) "consider all information about that individual or entity of which it is aware and all public information that is reasonably available to it or of which it should be aware." The annual certifications defined "material support and resources" to include, among other things, "training [and] expert advice or assistance."

7. Notwithstanding the above certifications, and during the period of time covered by the certifications, NPA provided training and expert advice or assistance to Iran, as well as to Hamas, PFLP and DFLP.

3

8. With respect to Iran, from 2001 through 2008 (*i.e.*, within the certifications' 10-year look back), NPA performed mine clearance activities in Iran that were integral to an Iranian oil development project. In connection with the project, NPA, among other things, (1) conducted risk assessments of the areas in Iran where the oil exploration and processing activities were to occur, (2) surveyed those areas for landmines and other unexploded ordnance, (3) trained members of the Iranian Army on how to conduct mine clearance activities, (4) accompanied and advised members of the Iranian Army as they conducted mine clearance activities in the relevant areas, and (5) conducted some mine clearance activities itself. NPA was an integral part of the project, and its involvement — which, as reflected above, included the provision of training and expert advice or assistance — was critical to the project's success.

9. With respect to Hamas, PFLP and DFLP, from 2012 through 2016, NPA provided representatives of those three SDN List entities with training and expert advice or assistance through a project that NPA funded called "Youth of Today . . . Leaders of Tomorrow" (the "Youth of Today project"). Through this project, young people in the Gaza Strip, aged 15 through 28, who were affiliated with one of the project's partner political parties — which included Hamas, PFLP and DFLP — received training aimed at making them more effective participants in the political process. Such training included programs intended to improve the participants' ability to organize, debate, negotiate, advocate for their positions, and resolve conflicts. These programs were taught by experienced professionals, were typically held over the course of multiple days, and, in total, comprised more than 250 hours of instructional time.

10. Through the Youth of Today project, NPA also funded numerous workshops attended by young people in the Gaza Strip and senior officials from the partner political parties, including Hamas, PFLP, and DFLP. The purpose of these workshops was to reduce a trust gap

that was perceived to exist between youth and the attending political parties, and to enhance communication between the two groups. The workshops provided the political parties with information that they could use to bridge this trust gap, including information reflecting (1) the results of polling (of youth) conducted by Youth of Today project staff, (2) specific areas of concern for youth, and (3) specific steps the parties could take to address those areas of concern and, thereby, make themselves more attractive to youth. Notably, NPA received reports stating that (1) the workshops were successful in bridging the above-referenced trust gap, and (2) certain of the political parties, including Hamas, PFLP and DFLP, had altered their behavior in response to information obtained through the workshops.

11. Because NPA provided training and expert advice or assistance to Iran (through the above-referenced oil development project), as well as to Hamas, PFLP and DFLP (through the Youth of Today project), its certifications to USAID that, to the best of its knowledge, it had not provided and would take all reasonable steps to ensure that it did not knowingly provide material support or resources to any prohibited parties were false. As a result of those false certifications, NPA induced USAID to provide it with a significant amount of grant funding that, but for the false certifications, USAID would not have provided. Consequently, NPA is liable under the FCA and the common law for damages and penalties, as discussed in detail below.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the claims brought herein under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the remaining claims pursuant to 28 U.S.C. § 1345.

13. Venue lies in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(c)(3), because NPA is a non-resident of the United States.

5

## PARTIES

14. Plaintiff is the United States of America suing on its own behalf and on behalf of USAID.

15. Defendant NPA, a Norwegian NGO, engages in humanitarian activities throughout the world, including the removal of landmines and other unexploded ordnance. NPA also funds organizations that operate internationally and purport to promote democratization, gender equality, youth participation in the political process, and human rights. In addition to its international work, NPA also manages in Norway reception centers for refugees from Syria, a first aid and rescue service, and an ambulance service.

## FACTUAL ALLEGATIONS

### I. The False Claims Act

16. The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). "Knowingly" is defined to include actual knowledge of, as well as reckless disregard or deliberate ignorance of, the truth or falsity of the information. *Id.* § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

### II. NPA's Certifications to USAID

17. Since at least 2012, NPA has received monetary grants from USAID to fund various projects and programs.

18. As a condition of receiving those grants, USAID required NPA to submit an annual application for grant funding. Each of those applications contained the following language to which USAID required NPA to certify:

> [NPA], to the best of its current knowledge, did not provide, within the previous ten years, and will take all reasonable steps to ensure that it does not and will not knowingly provide, material support or resources to any individual or entity that commits, attempts to commit, advocates, facilitates, or participates in terrorist acts, or has committed, attempted to commit, facilitated, or participated in terrorist acts . . . .

19. The annual applications defined the phrase "material support and resources" to mean

> currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

20. The annual applications also identified several "steps [that] may enable [NPA] to comply with its [material support] obligations," and it made clear that each of the identified steps was a requirement that NPA was obligated to follow. The required steps included the following:

> Before providing any material support or resources to an individual or entity, [NPA] will verify that the individual or entity does not . . . appear on the master list of Specially Designated Nationals and Blocked Persons, which is maintained by [OFAC] . . . .
>
>     \*    \*    \*
>
> Before providing any material support or resources to an individual or entity, [NPA] will consider all information about that individual or entity of which it is aware and all public information that is reasonably available to it or of which it should be aware.
>
> [NPA] also will implement reasonable monitoring and oversight procedures to safeguard against assistance being diverted to support terrorist activity.

7

21. The annual applications also contained the following language expressly incorporating the above-quoted certification language into any subsequently issued grant award: "The Certification is an express term and condition of any agreement issued as a result of this application, and any violation of it will be grounds for unilateral termination of the agreement by USAID prior to the end of its term."

22. In sum, as a condition of receiving grant funding from USAID, NPA certified annually that, to the best of its current knowledge, it had not provided (during the prior 10 years) and would take all reasonable steps to ensure that it did not knowingly provide material support or resources to any individual or entity that advocates, facilitates or participates in terrorist acts.

### III. NPA Provided Material Support and Resources to Iran, Hamas, PFLP and DFLP

23. Notwithstanding NPA's above-referenced certifications, from 2001 through 2008, NPA provided training and expert advice or assistance to Iran in connection with oil development activities in Iran. In addition, through the "Youth of Today . . . Leaders of Tomorrow" project, NPA provided training and expert advice or assistance to Hamas, PFLP and DFLP. Such conduct on the part of NPA — providing material support to a state sponsor of terrorism and three entities on the SDN List — rendered false NPA's certifications to USAID.

#### A. NPA Provided Material Support to Iran

24. From 2001 through 2008, the National Iranian Oil Company ("NIOC") contracted with a Norwegian oil company (the "Norwegian Oil Company") to perform oil development work in Iran. At all times relevant to this complaint, NIOC was owned or controlled by the Government of Iran.

25. The Norwegian Oil Company, in turn, contracted with NPA to plan and implement mine clearance activities in connection with the oil development project. The

Norwegian Oil Company also contracted with the Iranian Army to assist with the physical removal of landmines and other unexploded ordnance.

26. NPA was an integral part of the oil development project. Among other things, as set forth above, it (1) conducted risk assessments of the areas in Iran where oil exploration and processing activities were to occur, (2) surveyed those areas for landmines and other unexploded ordnance, (3) trained members of the Iranian Army on how to conduct mine clearance activities, (4) accompanied and advised members of the Iranian Army as they conducted mine clearance activities in the relevant areas, and (5) conducted some mine clearance activities itself.

27. In performing the above tasks, NPA officials regularly interacted and worked collaboratively with representatives of NIOC and the Iranian Army. For example, according to NPA's internal records, it worked with a particular NIOC manager on "[p]roject planning and field implementation," and it worked with a specific colonel in the Iranian Army for purposes of "daily planning and implementation of survey, mapping, clearance and verification [activities]." This colonel was the liaison between NPA and Iranian Army units in the field.

28. NPA's contracts with the Norwegian Oil Company confirm its material support to Iran in connection with this oil development project. For example, the contracts describe the project and NPA's role as follows:

> Buyer [*i.e.*, the Norwegian Oil Company] is engaged in exploration work in the Anaran area [in Iran], and ha[s] engaged the Iranian Army to clear possible mines and unexploded ordnance (UXO) in the area. Contractor [*i.e.*, NPA] is an independent, liaison free world expert in this field and Buyer has the intention in supporting such expertise on a large scale where the need for demining and explosive ordnance disposal (EOD) expertise is required, including awareness courses as well as direct involvement in supervision and quality control of such operations. In light of this, Buyer will use Contractor's expertise in the Anaran development . . . .

\* \* \*

Contractor shall assist Buyer's own team with an agreed number of well qualified demining and EOD specialists with long practical experience and good theoretical insight, who, together with Buyer must be able to co-operate with the Iranian army and all other relevant and involved authorities, in connection with the required mine and UXO clearance operation in the Anaran area in Iran.

29. NPA's contracts with the Norwegian Oil Company further stated, *inter alia*, that "Contractor's [*i.e.*, NPA's] personnel shall have the required experience to adequately supervise the demining of defined areas and shall offer quality assurance, control and support for the Iranian demining team," "Contractor's personnel shall as part of their scope develop a demining management system for the Iranian operation at requested locations," "Contractor shall, as part of [its] scope of work[,] provide[] Mine Risk Education for Buyer's personnel involved in the Anaran Project," and "Contractor shall perform escort and surveillance services to groups from the Anaran Project needing Anaran site visits and field verifications."

30. At all times relevant to this complaint, Iran was designated a "state sponsor of terrorism" by USDOS. That designation was based, in part, on USDOS's determination that Iran "repeatedly provided support for acts of international terrorism." *See* https://www.state.gov/j/ct/list/c14151.htm. Annual reports issued by USDOS throughout the relevant period reiterate Iran's designation as a "state sponsor" and identify it as a supporter of SDN List groups, such as "Hizballah and Palestinian terror groups." *See, e.g.*, https://www.state.gov/j/ct/rls/crt/45321.htm.

**B.    NPA Provided Material Support to Hamas, PFLP and DFLP**

31. From 2012 to 2016, NPA partnered with a third party (the "Third Party") to implement the "Youth of Today . . . Leaders of Tomorrow" project in the Gaza Strip. NPA provided the funding for this project, and periodically received reports from the Third Party detailing the goals of the project and the actions taken by the Third Party in furtherance of the

10

project. The actions taken by the Third Party in connection with the project were made possible by the funds provided by NPA.

32. As detailed in the above-referenced reports, the project's goals included (1) "building the capacities of youth leaders" — including youth leaders from the project's "partner political parties" — "in the areas of advocacy and lobbying"; and (2) "strengthen[ing] the relationship and communication between youth leaders and decision makers [from the project's partner political parties] in order to enhance the common understanding between them and [to] enhance [the parties'] response to youth demands." With respect to the former goal, NPA, through the Third Party, provided training to, among others, youth leaders from the partner political parties. With respect to the latter goal, NPA, through the Third Party, provided the partner political parties with information that they could use to bridge the "trust gap" that was understood to exist between the parties and youth in the Gaza Strip, including information reflecting (1) the results of polling (of youth) conducted by Youth of Today project staff, (2) specific areas of concern for youth, and (3) specific steps the parties could take to address those areas of concern and, thereby, make themselves more attractive to youth. The partner political parties included Hamas, PFLP and DFLP. For purposes of the project, "youth" referred to individuals aged 15 to 28.

33. Reports that NPA received from the Third Party indicated that youth members of Hamas, PFLP and DFLP participated in numerous training events that were designed to teach them skills so they could become more effective participants in the political process. For example, a report from December 2013, states that, during the period March 30, 2013, through April 15, 2013, "[a] total of 26 youth leaders" from "partner political parties," including Hamas, PFLP and DFLP, received 36 hours of training that was aimed at "enhancing [the participants']

skills [and] knowledge," including with respect to "Negotiation." The training programs were taught by experienced professionals and were typically held over the course of multiple days.

34. Similarly, reports that NPA received from the Third Party indicated that, as a result of numerous NPA-funded workshops attended by youth leaders and members of the partner political parties (including senior members of Hamas, PFLP and DFLP), the "trust gap between youth and Palestinian political parties [was] reduced leading to [an increase in] the youth motivation to participate in the political activities."

35. Moreover, the reports that NPA received reveal that Hamas, PFLP and DFLP used information that they obtained from their participation in these NPA-funded workshops to alter their behavior to make their organizations more attractive to youth. For example, a report from 2014 states that the Youth of Today project "contributed mainly in raising youth representation in top bodies inside the political parties," with "[t]he n[umber] of youth in top bodies inside Democratic Front [*i.e.*, DFLP] increased to 25% at least." Similarly, a report from 2015 states that, as a result of the project, the "Hamas movement, [] for the first time, allows their members to . . . participate in electing heads or leaders of the plenary sessions instead of the appointment process that w[as] followed before." In addition, a 2014 report quotes a "Leader in PFLP" as stating: "'The results of [a] political poll [conducted by Youth of Today project staff] reflect[ a] strong desire to [effect] change among youth, . . . [and because t]hey are able to threat[en] [to] abstain[] from voting to [put] pressure on us, [] it's better to take their demands into consideration.'" Finally, several of the reports indicate that, in connection with the project, Hamas, PFLP and DFLP signed a "code of conduct" that addressed specific concerns raised by youth.

36. At all times relevant to NPA's certifications — and throughout the duration of the Youth of Today project — Hamas, PFLP and DFLP were included in the SDN List.

### C. The Training and Expert Advice or Assistance that NPA Provided to Iran, Hamas, PFLP and DFLP Constituted Material Support or Resources

37. The demining-related training and other services that NPA provided to Iran in connection with the above-referenced oil development project constituted material support or resources within the meaning of the annual applications for funding that NPA submitted to USAID.

38. Similarly, the training and other services that NPA provided to members of Hamas, PFLP and DFLP through the Youth of Today project also constituted material support or resources. NPA's own documents establish that the project provided (1) young adult members of these SDN List entities with skills to become more effective participants in the political process, and (2) the entities' leaders with specialized information that they used to alter their behavior in order to become more attractive to youth — and thereby benefit from increased youth support.

39. As set forth above, the certifications that NPA signed defined material support and resources as including "training" and "expert advice or assistance," and those terms have been further defined in relevant statutes and case law in ways to clearly include the type of training and advice or assistance at issue here. *See, e.g.,* 18 U.S.C. § 2339A(b)(2) (defining training as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge," *id.* § 2339A(b)(3) (defining expert advice or assistance as "advice or assistance derived from scientific, technical or other specialized knowledge").

13

**D. NPA Failed to Disclose to USAID that It Had Previously Provided Material Support to a Prohibited Party, and It Failed to Take Reasonable Steps to Ensure that It Did Not Provide Material Support to Prohibited Parties on a Going Forward Basis**

40. As set forth above, starting no later than 2012, NPA submitted annual certifications to USAID. Through those annual certifications, NPA represented that, "to the best of its current knowledge, it did not provide within the previous ten years, and will take all reasonable steps to ensure that it does not and will not knowingly provide, material support or resources to any individual or entity that . . . advocates, facilitates, or participates in terrorist acts." Given its involvement in the above-referenced oil development project in Iran, NPA had no basis to make the historical representation in even its first certification. Moreover, NPA failed to take sufficient steps to ensure that, on a going forward basis, it did not provide material support to prohibited parties.

41. NPA also represented through its annual certifications that "[b]efore providing any material support or resources to an individual or entity," it would (1) "verify that the individual or entity does not . . . appear on the [SDN List]," and (2) "consider all information about that individual or entity of which it is aware and all public information that is reasonably available to it or of which it should be aware." NPA did not do these things, as confirmed by the fact that it allowed representatives from three SDN List entities to obtain valuable training and other specialized information through the Youth of Today project.

42. NPA further represented through its annual certifications that it would "implement reasonable monitoring and oversight procedures to safeguard against assistance being diverted to support terrorist activity." NPA did not do these things.

43. At all times relevant to this complaint, NPA failed to put in place internal policies or procedures to help ensure that it was complying with its obligations under the certifications.

44. Nor did NPA consult with USAID to discuss its activities in connection with the Iranian oil development project or the Youth of Today project.

IV. **As a Result of Its False Certifications to USAID, NPA Received Grant Funding to Which It Was Not Entitled**

45. To date, NPA has received millions of dollars in monetary grants from USAID to fund various projects and programs.

46. As a condition of receiving that grant funding, NPA submitted to USAID the above-referenced annual applications, in which NPA certified, *inter alia*, that it had not provided (during the prior 10 years) and would take all reasonable steps to ensure that it did not knowingly provide material support or resources to any entity that advocates, facilitates, or participates in terrorist acts. Those certifications were expressly incorporated into all subsequent grant funding requests submitted by NPA to USAID.

47. Had USAID known that NPA had engaged in the above-described conduct in connection with the Iranian oil development project and the Youth of Today project, USAID would have taken steps to address NPA's false certifications. For example, with respect to the oil development project, USAID would — at a minimum — have required NPA to provide suitable assurances that there would not be a recurrence of the same or similar conduct in the future.

## FIRST COUNT

**Violation of the False Claims Act: Presenting False Claims for Payment**
**(31 U.S.C. § 3729(a)(1)(A))**

48. The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

49. The United States seeks relief against NPA under 31 U.S.C. § 3729(a)(1)(A).

50. As set forth above, in connection with its applications for grant funding, NPA submitted certifications to USAID stating, *inter alia*, that it had not provided (during the prior 10 years) and would take all reasonable steps to ensure that it did not knowingly provide material support or resources to any prohibited parties. Those certifications were false because, as set forth above, NPA provided various types of training and expert advice or assistance to Iran, Hamas, PFLP and DFLP. NPA's false certifications induced USAID to (1) approve NPA's applications for grant funding, and (2) provide NPA with monetary grants that, but for the false certifications, USAID would not have provided. As a result, NPA knowingly presented or caused to be presented false or fraudulent claims for payment or approval to USAID in violation of 31 U.S.C. § 3729(a)(1)(A).

51. By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## SECOND COUNT

### Violation of the False Claims Act: Use of False Statements
### (31 U.S.C. § 3729(a)(1)(B))

52. The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

53. The United States seeks relief against NPA under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

54. As set forth above, in connection with its applications for grant funding, NPA submitted certifications to USAID stating, *inter alia*, that it had not provided (during the prior 10 years) and would take all reasonable steps to ensure that it did not knowingly provide material support or resources to any prohibited parties. Those certifications were false, and had the effect

16

of inducing USAID to (1) approve NPA's applications for grant funding, and (2) provide NPA with monetary grants that, but for the false certifications, USAID would not have provided. Therefore, in connection with its applications to USAID for grant funding, NPA knowingly made or used, or caused others to make or use, false records or statements that were material to false or fraudulent claims for funding submitted to USAID.

55. By reason of those false records or statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## THIRD COUNT

### Unjust Enrichment

56. The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

57. USAID provided monetary grants to NPA in reliance on certifications that (1) NPA submitted to it, and (2) were false as a result of NPA's provision of training and expert advice or assistance to Iran, Hamas, PFLP and DFLP, as set forth above. The circumstances of NPA's receipt of the monetary grants from USAID are such that, in equity and good conscience, NPA should not retain those funds, in an amount to be determined at trial.

WHEREFORE, the United States respectfully requests judgment against NPA as follows:

a.  On Counts One and Two (FCA), a judgment against NPA for treble damages and civil penalties to the maximum amount allowed by law;

b.  On Count Three (common law), a judgment against NPA for damages to the extent allowed by law.

Dated: March 29, 2018
       New York, New York

                                      GEOFFREY S. BERMAN
                                      United States Attorney for the
                                      Southern District of New York

By:     /s/ Christopher B. Harwood
           CHRISTOPHER B. HARWOOD
           Assistant United States Attorney
           86 Chambers Street, Third Floor
           New York, New York 10007
           Telephone: (212) 637-2728
           Facsimile: (212) 637-2786

           *Attorney for the United States of America*